IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 13, 2024 Session

**STATE OF TENNESSEE v. MICHAEL DAVID MOSLEY**

**Appeal from the Criminal Court for Davidson County**
**No. 2020-B-978      Angelita Blackshear Dalton, Judge**

_____

**No. M2023-00475-CCA-R3-CD**
_____

Defendant, Michael David Mosley, appeals his Davidson County Criminal Court convictions for two counts of first degree murder, one count of attempted first degree murder, and one count of assault, for which Defendant received a total effective sentence of two consecutive life terms plus 40 years. Defendant asserts on appeal that: (1) the indictment was invalid because it was signed by an Assistant District Attorney General; (2) the trial court erred by allowing evidence of other bad acts in contravention of Tennessee Rule of Evidence 404(b); (3) the trial court's instructions to the jury should have included a "no duty to retreat" instruction; (4) the State made improper comments during closing argument; (5) the evidence was insufficient to show premeditation; and (6) the trial court abused its discretion by imposing consecutive sentencing.[1] Having reviewed the entire record on appeal, the parties' briefs, and oral arguments, we affirm Defendant's convictions and sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and CAMILLE R. MCMULLEN, P.J., joined.

Manuel B. Russ (on appeal) and Kenneth Quillen (at trial), Nashville, Tennessee, for the appellant, Michael David Mosley.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy Hunter and Janice Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] We have reordered Defendant's issues for clarity.

# OPINION

In the early morning hours of December 21, 2019, Defendant stabbed three victims outside of the Dogwood Bar in Nashville, killing two of the victims, Clayton "Clay" King Beathard and Paul Douglas Trapeni, III, and severely injuring a third victim, Alva J. "A.J." Bethurum.

## *Evidence at Trial*

On the evening of December 20, 2019, the victims and a group of friends, all graduates of Battle Ground Academy ("BGA"), met at Willson McCullough's parents' house. The group also included Emma Yoder, Thobie Fauver, Patrick Wells, Campbell Parker, David Bates, and Sam Folks. They sat around "talking and hanging out." They decided to meet with another group of friends from high school at the Kung Fu Bar, across the street from the Dogwood Bar (the "Dogwood") in midtown Nashville. They had consumed alcohol at the McCullough residence and took Uber rides to the bar. They stayed at the Kung Fu Bar briefly and then walked over to the Dogwood. Ms. Fauver had "one drink" that night. She said the mood among the group was "[h]appy, fun light-hearted, just wanted to be together and have a good time." Mr. McCullough recalled "catching up with different people and having a good time talking about whatever it may be. . . ." Mr. Folks recalled that everyone was "drinking, laughing and having a good time[.]"

Meanwhile, Defendant and three others, Jaycie Harper, Daniel Sevilla, and Sergio Alvarado, met at Copa Cabana on Charlotte Pike for "a fun night [of] joking, drinking." From there, the group went "bar hopping" and ended up at the Dogwood Bar at around 1:57 a.m. Ms. Harper testified that she knew Defendant and Mr. Sevilla, but she did not know Mr. Alvarado, who introduced himself as "Poppie." Ms. Harper rode with Mr. Sevilla and Defendant to the Dogwood, and Poppie drove separately. Ms. Harper testified they went to the Dogwood for a "change of environment[,]" but she acknowledged that she testified at Defendant's preliminary hearing they went to the Dogwood to look for potential drug buyers. She said Poppie "had a substance, I don't know what it was, that he was trying to disp[o]se of."

While at the Dogwood, Ms. Harper saw Defendant and Poppie "mingling with people[,] and they had their phones out." At some point, Defendant and Poppie left the bar with another individual and walked down the street. Ms. Harper acknowledged that she later told detectives that she assumed they were walking to an ATM to withdraw money to purchase drugs. Defendant and the others returned to the Dogwood. Mr. Sevilla testified that they "were having a blast" and that Defendant approached "a female there by herself[.]" He said there was "nothing bad about it[.]"

- 2 -

Ms. Yoder testified that Defendant approached her and offered to buy her a drink, which she declined. Ms. Fauver remembered Defendant "just kept coming up, kept coming up" to Ms. Yoder on the dance floor. She said she and Ms. Yoder repeatedly avoided and ignored Defendant, but Defendant was "[r]elentless." At some point, Defendant "put his hands" on Ms. Yoder's hips, and she pushed him away.

Defendant approached Ms. Yoder again "right before" they were leaving the bar. She said, "he came over and put his arm around me and I think whispered something in my ear again and then I just turned away." Mr. Folks saw Defendant approach Ms. Yoder "kind of aggressively" on the dance floor, so he "stepped in and asked [Defendant] to step away." Mr. Folks put his arm around Ms. Yoder and told Defendant he was her boyfriend "just to get him away."

Shortly thereafter, the BGA group of friends decided to leave the bar. Ms. Fauver did not hear anyone make any threats to anyone as the group descended the stairs to exit the bar. Mr. Sevilla, however, testified "at the end of the night there was a guy that came up the steps and started an altercation." Ms. Harper "heard some commotion at the top of the stairs about [Defendant] trying to make a conversation with a girl that may or may not have had a boyfriend at the time." She ran back up the stairs and grabbed Defendant, "and was like, hey, you know, we didn't come here to do this." She attempted to "diffuse the situation" by motioning for the "BGA group" to go down the stairs to "create a space in between them so the tension would subside." She heard someone behind her, who "could have been [Mr. Sevilla] or Poppie," say there was going to be a fight. Mr. Sevilla recalled Defendant and Mr. Folk's "bickering back and forth."

Ms. Fauver recalled that the BGA group was standing on the sidewalk outside the bar. She was looking at her phone to find an Uber ride for her and Ms. Yoder when there was a sudden commotion and Ms. Fauver fell to the ground. She described it as "a tornado out of nowhere." She attempted to get up and exit the crowd and fell a second time, hitting her head on the pavement. She testified, "everything went black for a minute." Mr. Wells and Mr. Parker moved her to the sidewalk.

Ms. Yoder "saw a bunch of people in a circle kind of fighting." She saw someone "punch [Sam Folks] in the face really hard multiple times until he hit the ground[.]" Mr. Folks testified Defendant approached him and punched him in the face, knocking him into a parked car on the street. Ms. Harper also saw Defendant punch Mr. Folks. She got between Defendant and the BGA group in an attempt to deescalate the situation. She did not see anyone with a weapon. Ms. Harper testified, "I just remember seeing [Defendant] being attacked with more than one person on him at a time and then it seemed, to me, every time I separated a situation another escalated."

- 3 -

Mr. Sevilla testified, "[Defendant] got kind of crowded between a car and a bunch of people and then a fight broke out and then it was time to run for your life." Mr. Sevilla admitted he participated in the fight. At some point, a man "punched the living crap out of [him]" and "busted" his lip. The fight moved from the same side of the street as the bar to the opposite side of the street. Mr. Folks ran across the street to tell Defendant and his friends "to get out of [t]here" and that "there was no reason for a fight." Mr. Bethurum followed the fight across the street "to try to break it up or defend [his] friends."

Mr. Bethurum recalled seeing "a female" get "shoved to the ground," and he "confronted an individual" and "ended up hitting that individual in the face[.]" Mr. Bethurum was certain the individual he confronted was not Defendant. Then another person "reached around and stabbed" Mr. Bethurum. Mr. Bethurum thought he had been punched. He immediately lost vision in his left eye and moved away from the fight. Mr. Bethurum testified that the knife entered the side of his face and went through the posterior wall of his orbital and through his skull, causing an air pocket in his brain. He was also stabbed in his left elbow.

Mr. McCullough, who acknowledged his memory of the incident was "blurry" because he "was probably significantly intoxicated[,]" ran towards the crowd to "help [his] friends out if they were involved or break it up or do whatever [he] could." Video from outside the bar showed Mr. McCullough being hit. It also showed Mr. McCullough swing at Defendant. However, Mr. McCullough did not have an independent memory of being hit or swinging at Defendant. He described still photos from the videos, which showed him "tangled up" with Defendant. Mr. McCullough "vaguely" remembered "kind of chas[ing] . . . follow[ing]" Defendant and his friends to the parking lot where they got into their vehicles.

Mr. Sevilla "took off running" to his car. He was unarmed. Defendant and Ms. Harper returned to Mr. Sevilla's car, but Defendant exited the car and got into Poppie's car, which was parked behind them, and they drove away. The following day, Mr. Sevilla learned that two people had died and that he was a "[s]uspect in a stabbing." A few days later, he spoke with police about the incident.

David Hangley was "the number 2 security guard" at the Dogwood on the night of the incident. He testified that it had been "a relatively quiet night." After all the patrons exited the bar, Mr. Hangley saw, through the window in the stairwell, "a little huddle" of people across the street, "and it just looked like they were kind of rough housing with each other[.]" He recognized several people from inside the bar earlier that night. He saw two men "run off to the right towards a bar called Chuy's" and two other men come back towards the Dogwood. One of the men "kind of dropped to a knee" before Mr. Hangley lost sight of him. Mr. Hangley went outside and saw Paul Trapeni on the ground

- 4 -

surrounded by a large group of people. Mr. Hangley saw Mr. Beathard covered in blood. Mr. Hangley gave medical aid to Mr. Beathard while his manager, Jacob Asher, attempted to help Mr. Trapeni.

Mr. Beathard had "roughly a one to two inch wide 3[-] or 4[-]inch long puncture or gash in between his ribs on his left side." He was conscious and "seemed alert." While Mr. Hangley applied pressure to his wound, he felt a tap on his back and heard someone ask if Mr. Beathard was okay. Mr. Hangley turned around and saw Mr. Bethurum, who had gash over his eye and across his cheek. Mr. Bethurum seemed to be "in shock" and thought that someone had hit him in the face. Mr. Hangley called for a third security guard to assist Mr. Bethurum.

Mr. Asher was the head of security at the Dogwood on the night of the incident. He testified that the bar closed at 3:00 a.m. and that no one was allowed entry after 2:30 a.m. Mr. Asher was beginning his "closing duties" when he learned of an "altercation" outside the bar. He looked outside and saw "a bunch of people, you know, pushing and shoving each other, nothing too crazy[.]" He said it was not uncommon to see altercations after closing and that bar staff was prohibited from "getting involved," but he testified, "[I]f there was anything that was ever life-threatening[,]" he would intervene. Mr. Asher did not view the altercation as life-threatening, and he did not see anyone with a weapon. At some point, however, he learned that someone had been stabbed, and he ran outside to assist the victims until police and EMS arrived.

Mr. Trapeni was nonresponsive and surrounded by blood. Mr. Asher found a laceration on his right side near his diaphragm and applied pressure to stop the bleeding. Mr. Asher rolled Mr. Trapeni onto his side to prevent asphyxiation from vomit. Mr. Trapeni made eye contact with Mr. Asher, and Mr. Asher talked to him, "trying to keep his . . . spirits up[.]" Mr. Asher then heard Mr. Trapeni "let out [a] groan[,]" which Mr. Asher perceived to be his last breath.

Paramedics transported Mr. Trapeni, Mr. Beathard, and Mr. Bethurum to Vanderbilt University Medical Center. Mr. Trapeni and Mr. Beathard both died from their stab wounds. Mr. Bethurum underwent several eye surgeries and lost vision in his left eye.

Emma Yoder described Clay Beathard as "an amazing athlete" and "a family man," who had "a heart of gold[.]" Thobie Fauver described him as "nothing but gentle and kind." Ms. Fauver described Paul Trapeni as "[v]ery goofy, class clown, all the way. Gentle, teddy bear like, just a good kid." She testified that neither of the victims were the type of person to instigate a fight. Patrick Wells described Mr. Beathard and Mr. Trapeni as "larger than life people[.]" Campbell Parker said none of the victims were known to start fights or carry a weapon. No weapons were found on the victims or at the crime scene.

Metro Nashville Police Department ("MNPD") Officer Jason Terry arrived at the scene and reviewed security video from the Dogwood and a nearby bar called Loser's. Officer Terry observed "the beginnings of a blood trail" that "cross[ed] over Division Street" and a "considerable amount of blood" on the sidewalk beside the Dogwood. DNA analysis showed that the blood on the sidewalk was Mr. Bethurum's.

MNPD Detective Zachariah James Bevis was the lead detective in the case. He reviewed surveillance video from inside and outside the bar that night. The videos were introduced as exhibits at trial and played for the jury. Detective Bevis explained that video showed Defendant approach Mr. Folks and "start[ ] punching him in the face." Defendant then "br[oke] free" and stepped back, "fixed his hair, gathered himself, and ran back in towards the crowd and . . . [was] confronted by [Mr. Beathard.]" Defendant was "jumping around next to [Ms. Harper]" and began punching Mr. Beathard. Mr. Beathard pushed Defendant to the ground. Defendant, Mr. Sevilla, and Mr. Alvarado remained next to Mr. Beathard, and Ms. Harper tried to keep everyone separated. Mr. Beathard appeared to shove Ms. Harper. Defendant "side-stepped" Ms. Harper, "crouched down[,]" and "lunge[d] at Mr. Beathard[,]" stabbing him in the chest. Defendant lunged at Mr. Bethurum, and Mr. Bethurum backed up. Defendant then stabbed Mr. Trapeni "in the same manner" he stabbed Mr. Beathard. Defendant "fixed his hair again and adjusted his shirt and [ ] walk[ed] away." Defendant and his friends then walked in the direction of their cars.

An arrest warrant for Defendant was issued on December 23, 2019. Initially, detectives were unable to locate Defendant, so the Tennessee Bureau of Investigation ("TBI") included him on its "top ten most wanted" list. Detective Bevis testified that Defendant had "swapped phones." On December 25, 2019, TBI agents received "a ping" on Defendant's new phone and located him at a vacant house in Ashland City, Tennessee. The TBI obtained a search warrant for the home, and a SWAT team assisted in executing the search warrant. Defendant, smoking a cigar, walked out of the house and surrendered to police. Detective Bevis did not observe any injuries to Defendant's face, but Defendant had injuries to his right hand. Defendant had shaved his head since the stabbing. Investigators also located a black Honda Civic that was registered to Defendant in Joelton and executed a search warrant on the vehicle. A knife was recovered from the driver's door pocket. There was no blood on the knife, so officers did not submit the knife for DNA testing.

Defendant did not testify or present any proof at trial. The jury convicted Defendant as charged.

*Sentencing*

At the sentencing hearing, the State introduced Defendant's presentence report, certified copies of Defendant's prior felony convictions for two counts of aggravated assault, two counts of robbery, one count of theft, two counts of motor vehicle burglary, and one count of attempted burglary, as well as his juvenile convictions for felony theft and misdemeanor assault. The State also offered victim impact statements by Mr. Bethurum, Mr. Trapeni's sister, and Mr. Beathard's father.

The State presented testimony of Bobby Whitt, the Assistant Jail Administrator for the Cheatham County Jail at the time of Defendant's arrest. Mr. Whitt testified that Defendant had "several" violent incidents while incarcerated at the jail. While in the booking area, Defendant "grabbed [an]other inmate and started slamming the inmate's head into the cell floor until the officers were able to restrain him." Defendant was also involved in a riot at the jail, in which he and several other inmates attacked Daniel Baker, another inmate. Defendant kicked Mr. Baker's head while another inmate held him in a choke hold. Video recordings of the incidents were admitted as exhibits. On cross-examination, Mr. Whitt testified that Mr. Baker had been indicted for killing Defendant's half-brother.

Defendant gave an allocution in which he expressed remorse to the victims' families and stated that the murder of his brother in 2016 had "far-reaching" "ramifications" on him and his family. Defendant stated, "I never intended to take these young men's lives and put you through so much pain and suffering."

The trial court determined that Defendant was a Range II multiple offender, having four Class C felony convictions. The court applied the following enhancement factors: Defendant had a history of criminal convictions or behavior in addition to those necessary to establish the appropriate range; Defendant treated Mr. Bethurum with exceptional cruelty during the commission of the offense; the injuries inflicted on Mr. Bethurum were particularly great; Defendant had no hesitation about committing a crime when the risk to human life was high; Defendant committed the instant offenses while released on bail; and Defendant was adjudicated to have committed a delinquent act as a juvenile that would constitute a felony if committed as an adult. *See* T.C.A. § 40-35-114(1), (5), (6), (10), (13)(A), (16). The court found no applicable mitigating factors.

The trial court found that Defendant had an extensive record of criminal activity, that he was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, that consecutive sentencing was necessary to protect the public from further serious criminal conduct by Defendant, and that consecutive sentencing was reasonably related to the severity of the offenses. *See* T.C.A. 40-35-115(b)(2), (4); *State v. Wilkerson*, 905

S.W.2d 933, 939 (Tenn. 1995). Additionally, the court found that consecutive sentencing was mandatory to a sentence for a felony Defendant committed while he was released on bail and was convicted of both offenses. Tenn. R. Crim. P. 32(c)(3).

The trial court imposed life sentences in counts 1 and 2, 40 years in count 3, and 11 months and 29 days in count 4. The court ordered "count 2 to be served consecutively to count 1, and count 3 to be served consecutively to count 2." The trial court further ordered "count 4 to be served concurrently to count 1 for an effective sentence of two consecutive life sentences plus forty years."

## *Analysis*

### *Indictment*

Defendant complains that the indictment was invalid because it was not filed by a licensed attorney. The State responds that the indictment was properly signed by an assistant district attorney general and that Defendant has nevertheless waived any challenge to the indictment by failing to raise it prior to trial. We agree with the State.

The sufficiency of an indictment is a question of law that we review de novo. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn.1997). A motion alleging a defect in the indictment must be made prior to trial, "but at any time while the case is pending, the court may hear a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense." Tenn. R. Crim. P. 12(b)(2)(B). An objection which is required to be raised pretrial is waived if it is not timely made. Tenn. R. Crim. P. 12(f)(1).

In *State v. Nixon*, this Court explained that the objections that must be challenged prior to trial or are subject to waiver include "defects in the indictment that go to matters of form rather than substance," including statutory requirements such as that the indictment must be signed by the district attorney general and that the indictment identify the person charged, the time of the offense, and the location of the offense. 977 S.W.2d 119, 121 (Tenn. Crim. App. 1997).

Defendant raised his objection to the indictment for the first time in his amended motion for new trial. Defendant's challenge to the indictment is one of form over substance; thus, the challenge is waived. Despite waiver, however, the indictment in this case is a valid indictment. It reads in relevant part: "Signed by Amy Hunter, for Glenn Funk the District Attorney General for the 20th Judicial District and by the grand jury foreperson." In his appellate brief, Defendant asserts, "the Board of Professional Responsibility database contains no attorney licensed in the State of Tennessee named 'Amy Hunter.'" At the hearing on Defendant's motion for new trial, the State presented

evidence that General Hunter, who had recently changed her name from Amy Hunter Eisenbeck to Amy Hunter, was an attorney in good standing and was "empowered to sign official documents such as indictments . . . directly from General Funk."

Furthermore, this Court has held that "an indictment signed by an assistant district attorney general, rather than the district attorney general, is a valid indictment." *State v. Plasket*, No. M2008-01876-CCA-R3-CD, 2009 WL 1313365, at *2 (Tenn. Crim. App. May 11, 2009). Defendant is not entitled to relief on this issue.

*Motion to Exclude Evidence*

Defendant asserts that the trial court erred by allowing Ms. Harper to testify at trial about Defendant's involvement in an alleged drug sale on the night of the offense. Defendant sought to exclude the testimony in a pretrial motion. Defendant argued the testimony was inadmissible hearsay, unreliable, and irrelevant, and that even if relevant, the trial court should exclude the evidence pursuant to Tennessee Rule of Evidence 404(b). The State argued that the evidence was (1) relevant to show that Defendant was engaged in unlawful activity when he committed the offenses and thus not entitled to a "no duty to retreat" jury instruction, and (2) to provide context as to why Defendant was at the crime scene.

At a hearing on Defendant's motion, the State introduced a recording of the preliminary hearing in this case, which included the testimony of Ms. Harper, and the trial court heard the arguments of counsel. The court subsequently entered a written order denying Defendant's motion. The court found "that a material issue exist[ed]" to demonstrate Defendant "was engaged in an unlawful activity, other than conformance conduct, . . . to provide contextual background for the State to prove necessary elements that [Defendant] did not act in self-defense." The court also concluded that Ms. Harper's testimony was "clear and convincing based on her firsthand knowledge and observations of the events."

At trial, defense counsel objected to Ms. Harper's testimony on the basis of Rule 404(b) and requested a jury-out hearing on the relevance of Defendant's "drug activity." During a bench conference, defense counsel argued, "no context is needed why people go from one bar to another" and that even if relevant, "the danger of unfair prejudice . . . is overwhelming." The trial court, relying on its prior findings, ruled that Ms. Harper's testimony was admissible.

A trial court's decision to admit or exclude evidence will not be overturned on appeal absent an abuse of discretion, provided that the court adhered to the procedure set forth in Rule 404(b). *State v. Kiser*, 284 S.W.3d 227, 288 (Tenn. 2009) (citing *State v.*

*DuBose*, 953 S.W.2d 649, 652 (Tenn.1997)).  Under an abuse of discretion standard, we will reverse a decision to admit evidence only when the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining."  *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Tennessee Rule of Evidence 404(b) provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes.  The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).  The terms of Rule 404(b) direct the trial court to first hold a hearing outside the presence of the jury to assess the criteria set forth in the Rule.  Tenn. R. Evid. 404(b)(1).  This Court has previously observed that a trial court may, as in this instance, conduct the required hearing prior to trial.  *State v. Gilley*, 173 S.W.3d 1, 6 (Tenn. 2005).  Nevertheless, because "the Rule 404(b) criteria . . . require consideration of the evidence at trial," we have cautioned that "if pretrial evidentiary rulings are made, they may need to be reconsidered or revised based on the evidence presented at trial."  *Id*.

For the second prong, the trial court determined that a material issue existed "to provide contextual background for the State to prove necessary elements that [Defendant] did not act in self-defense."  Evidence offered to show a contextual background need not be excluded under Rule 404(b) simply for the reason that it involves evidence of prior acts.  *State v. Gilliland*, 22 S.W.3d 266, 271 (Tenn. 2000).  Contextual background evidence, which contains proof of other crimes, wrongs, or acts, may be offered as an "other purpose" under Rule 404(b) when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case.  *Id*. at 272.  Not all background evidence, however, will be admissible, and trial courts must strike a careful balance between evidence that will provide context for the jury and evidence that will only tend to show a defendant's propensity to commit crimes.  *Id*.

- 10 -

Defendant contends that evidence that he was involved in an alleged drug transaction at the Dogwood on the night of the offense did not fill a conceptual void in the State's presentation of its case. Citing *State v. Cox*, Defendant asserts that "[i]t strains credulity to say that [the] jury . . . would have been 'baffled' by the fight that took place outside [the Dogwood]" had the jury not heard evidence that Defendant engaged in a drug sale at the Dogwood on the night of the incident. No. M2017-02178-CCA-R3-CD, 2019 WL 1057381, at *8 (Tenn. Crim. App. Mar. 6, 2019) ("Crimes admitted to tell the 'complete story' should be only those 'so inextricably connected in time, place, or manner' that the jury would be baffled by the charged crime without hearing the evidence of the other crime.") (quoting Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence, § 4.04[13] (6th ed. 2011)), *no perm. app. filed*.

The State argues that evidence of Defendant's alleged drug activity was relevant to show that he was engaged in unlawful activity, which is significant as it relates to Defendant's next issue, whether the trial court erred by not instructing the jury that Defendant had "no duty to retreat." As discussed below, "a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, . . . ." T.C.A. § 39-11-611(b)(2) (2018).

The two issues are so closely related that the trial court here seemingly merged its analysis, ruling that the material issue for which evidence of Defendant's drug activity was relevant was the basis for denying Defendant's request for the "no duty to retreat" jury charge. Indeed, the analysis for both issues is substantially similar. Our supreme court recognized in *State v. Perrier*, "Because the allegedly unlawful activity will oftentimes be uncharged conduct similar to evidence of prior bad acts, the procedure outlined in Tennessee Rule of Evidence 404(b) should be utilized" in determining whether to give the full self-defense jury instruction. 536 S.W.3d 388, 403 (Tenn. 2017).

Here, the trial court substantially followed the procedure set forth in Rule 404(b). After a hearing, the trial court found clear and convincing evidence of Defendant's involvement in drug activity and that the evidence was material to provide contextual background. We thus review its decision for an abuse of discretion. We note, however, that the trial court did not make an explicit finding that the probative value of the evidence outweighed the danger of unfair prejudice. Tenn. R. Evid. 404(b)(4). As for the findings outlined in *Gilliland*, the trial court, at least implicitly, determined that the absence of the evidence would create a conceptual void in the State's presentation of the case and would have likely confused the jury as to the material issues in the case. *See Gilliland*, 22 S.W.3d at 272.

As the trial court stated in its order, when a defendant raises self-defense, it is the State's burden to show that the defendant did not act in self-defense. *See State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013). Part and parcel of showing that Defendant did not act in self-defense is rebutting proof that Defendant was not engaged in unlawful activity and was in a place he had a right to be. Nevertheless, evidence that Defendant participated in an alleged drug sale while at the Dogwood was not necessary to provide a complete story of the offenses that occurred. There was no proof that the alleged drug sale had anything to do with the victims, their companions, or the altercation that ultimately took place and ended with the death of the victims. Furthermore, the evidence has very little, if any, probative value and at least some prejudicial effect. We conclude, therefore, that the trial court abused its discretion by not excluding the evidence.

We must now decide whether this error was harmless in the context of this case. Determining whether evidence "more probably than not" affected the jury's decision-making process can be a difficult question. Determining the harmfulness of erroneously admitted evidence depends on the strength of the evidence as a whole. *See State v. Rodriguez*, 254 S.W.3d 361, 371-72 (Tenn. 2008). In this case, the jury heard testimony and saw video of Defendant approaching Mr. Folks outside of the Dogwood and repeatedly punching him, which initiated a fight between the BGA group and Defendant's group. Video showed Mr. Beathard push Defendant to the ground. Defendant then stood up, crouched down, and lunged at an unarmed Mr. Beathard, fatally stabbing him in the chest, then fatally stabbing Mr. Trapeni in the chest and back, and finally lunging at Mr. Bethurum from behind, stabbing him in the face and causing permanent injuries.

The strength of the State's evidence was great. In light of the fact that the alleged drug activity was dissimilar to the offenses for which Defendant was convicted, and the jury was therefore unlikely to view the evidence as propensity evidence, we find it unlikely that Ms. Harper's testimony that she believed Defendant was involved in selling drugs had a "substantial and injurious" impact on the jury's decision-making process. *Rodriguez*, 254 S.W.3d at 372. Additionally, the trial court instructed the jury to consider evidence of Defendant's alleged drug activity "only . . . for the context of why [Defendant] and his companions went to the [D]ogwood bar and not as to the guilt or innocence of the charges in th[e] indictment." Defendant has not demonstrated that the error more probably than not affected the outcome of the trial. *State v. Toliver*, 117 S.W.3d 216, 231 (Tenn. 2003); *see also* Tenn. R. App. P. 36(b). He is therefore not entitled to relief as to this issue.

*Duty to Retreat Instruction*

Defendant contends that the trial court erred by omitting from the self-defense jury instruction language that Defendant had "no duty to retreat." The State responds that the trial court properly modified the instruction after finding that Defendant had engaged in

unlawful activity. Alternatively, the State asserts that if the trial court erred by omitting the instruction, it was harmless beyond a reasonable doubt.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citations omitted). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An erroneous jury instruction may deprive the defendant of his constitutional right to a jury trial. *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000). As part of their instructions in criminal cases, trial courts must describe and define each element of the offense or offenses charged. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *Id.* (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). We review the propriety of the jury instructions de novo with no presumption of correctness. *Perrier*, 536 S.W.3d at 403.

At the time of the offenses, Tennessee Code Annotated section 39-11-611(b)(2) provided as follows:

> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b) (2018).

In *Perrier*, our supreme court held that the trial court, as part of its threshold determination of whether to charge self-defense, should decide whether to charge the jury that a defendant did not have a duty to retreat. As part of that decision, "the trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction

- 13 -

would not apply." 536 S.W.3d at 403. The *Perrier* Court did not address whether the unlawful activity by the defendant in that case had to have a causal nexus to the defendant's perceived need to defend himself. *Id*. at 404. This Court subsequently held in *State v. Booker*, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at \*26 (Tenn. Crim. App. Apr. 8, 2020), *rev'd on other grounds by State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), that there must be a causal nexus "between a defendant's unlawful activity and his or her need to engage in self-defense."

Defendant contends that the unlawful activity he was engaged in had no causal nexus with the charged offenses. The State argues that the causal connection between Defendant's alleged drug activity was established by evidence that the purpose of Defendant's presence at the Dogwood was to sell drugs, and Defendant "accomplished this purpose by 'mingling' with the bar patrons, including the BGA group." The State argues Defendant's interactions with the BGA group inside the bar "predicated the fight, which led [D]efendant to commit the offenses in this case."

The trial court made no determination about whether a causal connection existed between the unlawful activity and the offenses. There was no evidence that Defendant's interactions with the BGA group prior to the fight were related to Defendant's earlier drug activity. The evidence showed that Defendant approached Ms. Yoder in a flirtatious manner, Ms. Yoder rejected his advances, and Mr. Folks intervened to shield Ms. Yoder from further advances by Defendant. Once outside the bar, Defendant initiated a fight with the BGA group when he approached Mr. Folks and repeatedly punched him in the face.

The trial court erred in failing to instruct the jury that Defendant had no duty to retreat because Defendant's earlier drug activity had no causal nexus with the offenses at issue here. However, we agree with the State that the trial court's error in omitting the "no duty to retreat" instruction was harmless beyond a reasonable doubt. A "trial court's error in instructing the jury [is] harmless beyond a reasonable doubt" if "no reasonable jury would have accepted the defendant's self-defense theory." Here, the proof established that Defendant was the initial aggressor. Defendant initiated a fight between the two groups when he punched Mr. Folks, which led to Defendant's stabbing Mr. Beathard, Mr. Trapeni, and Mr. Bethurum. "The defense of self-defense is generally not available if the defendant provoked or consented to the danger." *Hawkins*, 406 S.W.3d at 128. Therefore, even if the trial court incorporated the "no duty to retreat" part of the self-defense jury instruction, we conclude that no reasonably jury would have accepted Defendant's self-defense theory. Defendant is therefore not entitled to relief on this issue.

*Closing Argument*

Defendant contends that the prosecutor made improper statements during closing argument. The State responds that Defendant waived this issue by failing to object contemporaneously and that Defendant has not satisfied the criteria for plain error relief. We agree with the State.

"[I]t is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument[,]" as "[a] contemporaneous objection provides the trial court with an opportunity to assess the State's argument and to caution the prosecution and issue a curative instruction to the jury if necessary." *State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010) (footnote omitted). A defendant's failure to object contemporaneously will constitute a waiver of the issue on appeal. *Id*. at 58 (citing Tenn. R. App. P. 36(a)). "[P]lain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for a new trial." *State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022).

We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

Interestingly, Defendant does not address the *Adkisson* factors in his brief but rather asserts that we should conduct a plenary review of the prosecutor's comments because Defendant raised the error in his motion for new trial, explaining that "he could not object to the improper closing argument contemporaneously because it would draw attention to the error and run afoul of Article VI § 9 of the Tennessee Constitution which prohibits trial judges from charging 'juries with respect to matters of fact[.]'"

Our supreme court has made clear, "plain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument

- 15 -

when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for a new trial." *Enix*, 653 S.W.3d at 700-01. Defendant's admission on appeal that it was a strategic decision not to object at trial means Defendant has failed to satisfy the fourth *Adkisson* factor. Notwithstanding his failure to establish at least one of the factors necessary to show plain error, Defendant's motion for new trial and amended motion for new trial did not include one of the two claims of prosecutorial misconduct he now raises on appeal.

In his motion for new trial and amended motion for new trial, Defendant alleged, "The State, in its Final Closing Argument, launched an ad hominem attack on the defense counsel as 'cruel' and his argument as 'unconscionable.' Such prosecutorial misconduct denied the defendant a fair trial." On appeal, Defendant asserts that the prosecutor interjected her personal opinion about the evidence and attempted to inflame the jury by making comments that it was "ridiculous and unconscionable" and "wrong and . . . cruel" to place blame on members of the BGA group. Defendant also asserts, for the first time on appeal, that the prosecutor misstated the law when she said that premeditation "does not apply to the attempted homicide of AJ Bethurum[.]"

As to Defendant's claim that the prosecutor misstated the law, the trial court instructed the jury that premeditation is an essential element of attempted first degree murder and defined premeditation for the jury. Jurors are presumed to have followed the court's instructions. *See State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006); *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001). As to Defendant's claim that the prosecutor's comments that placing blame on members of the BGA group was "ridiculous," "unconscionable," and "cruel to do to these people," the trial court found that the comments "were not directed at any specific person" and that the prosecutor "was making commentary on the argument of counsel for [ ] Defendant and was not personally attacking defense counsel."

Having reviewed the entire record, we conclude that any improper comments during closing argument by the prosecutor were either cured by the trial court's instructions to the jury or not so inflammatory or improper that they affected the outcome of the trial to Defendant's prejudice. *See State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008). Defendant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence to support his convictions, arguing that the proof did not establish premeditation because there was not enough time for him to exercise reflection and judgment. The State responds that the evidence was sufficient. We agree with the State.

When reviewing the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Defendant was convicted of two counts of first degree premeditated murder and one count of attempted first degree murder. First degree premeditated murder is defined as "[a] premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). Premeditation requires that the act be "done after the exercise of reflection and judgment" and committed when the accused "was sufficiently free from excitement and passion as to be capable of premeditation." *Id*. § 39-13-202(e). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). As instructed to the jury, criminal attempt occurs when a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3).

Our supreme court has identified several specific circumstances that may demonstrate the existence of premeditation, including: the use of a deadly weapon on an unarmed victim; the particular cruelty of the killing; threats or declarations of intent to kill; the procurement of a weapon; any preparations to conceal the crime undertaken before the crime was committed; the destruction or secretion of evidence of the killing; calmness after the killing; evidence of motive; the use of multiple weapons in succession; the infliction of multiple wounds or repeated blows; evidence that the victim was retreating or attempting to escape when killed; the lack of provocation on the part of the victim; and the failure to render aid to the victim. *State v. Reynolds*, 635 S.W.3d 893, 916-17 (Tenn. 2021) (citations omitted). This list, however, "is not exhaustive," and "the trier of fact is not limited to any

specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *Id*. at 917.

Defendant concedes that "at some point in the fight, he brandished a knife that he already had on his person and proceeded to stab Mr. Beathard, Mr. Trapeni, and Mr. Bethurum, the first two fatally." He argues that there was insufficient evidence that Defendant, while engaged in a brawl, had time "to use reflection and judgment that would allow him to form premeditation."

The evidence at trial established that Defendant approached Ms. Yoder repeatedly inside the bar, she rejected his advances, and Mr. Folks intervened. While leaving the bar, one of Defendant's friends said there was going to be a fight, referring to the BGA group. Once outside, Defendant became the initial aggressor when he punched Mr. Folks several times in the face, knocking him to the ground. Defendant then engaged Mr. Beathard and began punching him. Defendant pushed Mr. Beathard to the ground. Despite attempts by Ms. Harper to separate the two groups and deescalate the situation, Defendant procured a knife, stepped around Ms. Harper, and lunged first at an unarmed Mr. Beathard and then an unarmed Mr. Trapeni, fatally stabbing both men in the chest. Defendant reached around Mr. Bethurum and stabbed him in the eye and elbow. Defendant inflicted multiple wounds on two of the victims.

Other circumstances also support the jury's finding that Defendant acted with premeditation. Defendant showed calmness immediately after the stabbings, fixing his hair and adjusting his shirt before fleeing the scene. Defendant attempted to conceal evidence of the crime. He switched phones, shaved his head, abandoned his car, and hid in a vacant house until he was apprehended by police. There was sufficient proof of premeditation. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant asserts that his two consecutive life sentences plus 40 years is excessive because it twice exceeds the "normal life span of the average American adult male." He argues the trial court misapplied enhancement factor (5) and erred by imposing consecutive sentencing.

This Court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). The trial court is granted broad discretion to impose a sentence anywhere within the applicable range and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles

listed by statute." *Id*. at 709-10. We, likewise, review the trial court's order of consecutive sentencing for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. *See State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the same deferential standard announced in *Bise*, 380 S.W.3d at 682, to the trial court's consecutive sentencing decisions).

In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

The record reflects that the trial court considered the evidence at trial and at the sentencing hearing, the presentence report, the victim impact statements, Defendant's statement in allocution, the principles of sentencing, the applicable enhancement and mitigating factors, and the nature of the offenses in imposing Defendant's within-range sentences. As a result, the court's determinations are afforded a presumption of reasonableness.

Defendant challenges the trial court's application of enhancement factor (5), that he treated Mr. Bethurum with exceptional cruelty. The State argues that the evidence supports the trial court's application of this factor. "[P]roper application of enhancement factor (5) requires a finding of cruelty under the statute 'over and above' what is required to sustain a conviction for an offense." *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting *State v. Embry*, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)). The evidence must support a finding that "the infliction of pain or suffering [is] for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as a means of accomplishing the crime charged." *State v. Haynes*, No. W1999-01485-CCA-R3-CD, 2000 WL 298744, at *3 (Tenn. Crim. App. Mar. 14, 2000). Whether a defendant treats a victim with exceptional cruelty is "a matter of degree." *State v. Moore*, No. 02C01-9306-CC-00126, 1994 WL 245481, at *2 (Tenn. Crim. App. June 8, 1994).

The trial court considered "the severity of Mr. Bethurum's injuries" and found that Defendant's actions were "separate and distinct from those constituting the offense[.]" *See State v. Poole*, 945 S.W.2d 93, 99 (Tenn. 1997). The State asserts that Defendant "needlessly" stabbed Mr. Bethurum two times and "the stabbing of Mr. Bethurum's eye

and face would constitute an action separate from the convicting offense." The State further asserts that the injury to Mr. Bethurum's eye was exceptionally cruel in that it resulted in the loss of his vision.

In our view, however, the record does not support the application of this enhancement factor. Although we agree that Mr. Bethurum's injuries were particularly great, the evidence does not suggest that Defendant inflicted pain or suffering upon Mr. Bethurum for its own sake or his gratification, nor does the evidence suggest that Defendant inflicted additional injuries on Mr. Bethurum that were separate and distinct from those associated with a stabbing. Furthermore, the evidence does not suggest that Mr. Bethurum was treated with exceptional cruelty prior to the stabbing. Accordingly, the trial court's application of enhancement factor (5) is not supported by the evidence. However, the erroneous application of a single enhancement factor does not warrant relief because the record otherwise supports the within-range sentence imposed by the trial court, and the court applied five other enhancement factors that have not been challenged by Defendant. Defendant is not entitled to relief on this basis.

As to consecutive sentencing, Tennessee Code Annotated section 40-35-115(b) lists the discretionary criteria for imposing consecutive sentencing. Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one [criterion] need exist to support the appropriateness of consecutive sentencing." *State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). If a trial court finds one of these grounds by a preponderance of the evidence, the trial court may "then choose whether, and to what degree, to impose consecutive sentencing based on the facts and circumstances of the case, bearing in mind the purposes and principles of sentencing." *State v. Perry*, 656 S.W.3d 116, 127 (Tenn. 2022).

In this case, the trial court found two factors: Defendant was an offender whose record of criminal activity was extensive, and Defendant was a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. T.C.A. § 40-35-115(b)(2), (4). Defendant does not challenge either of these findings by the trial court. He argues instead that his consecutive life sentences are excessive and were not the least severe measure necessary to achieve the purposes for which the sentences were imposed.

The trial court articulated its reasons for the sentences imposed in a written order. The court found that in addition to his extensive criminal history, Defendant showed violent behavior on two separate occasions while being held in the Cheatham County Jail. The court found that "Mr. Bethurum was inflicted with a permanent and life altering injury as a result of being stabbed in the face by [D]efendant" and that Defendant "also placed multiple people . . . in the zone of danger of [Defendant]'s assaultive conduct." Finally,

the trial court found that based on the circumstances of the offenses, consecutive sentencing was necessary to protect the public from further criminal conduct by Defendant.

The trial court addressed on the record the principles and purposes of our Sentencing Act. We conclude that the trial court did not abuse its discretion by imposing consecutive sentencing. Defendant is not entitled to relief on this issue.

CONCLUSION

Based on our review, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE